## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
| ) | |
|     **Plaintiff,**      ) | |
| ) | |
|     **vs.**      ) | **Case No. 09-40071-01-JAR** |
| ) | |
| **DENNIS DEAN NEFF,**      ) | |
| **RALFEAL ERON CARR,**      ) | |
| ) | |
|     **Defendants.**      ) | |
| _____) | |

### MEMORANDUM AND ORDER
### DENYING DEFENDANTS' MOTIONS TO SUPPRESS

This matter comes before the Court on defendant Ralfeal Eron Carr's Motion to Suppress (Doc. 18) and defendant Dennis Dean Neff's Motion to Suppress Evidence (Doc. 27). A suppression hearing was held on December 7, 2009, and testimony was presented. The Court has reviewed the evidence and the parties' submissions and is prepared to rule. For the reasons set forth in detail below, defendants' motions are denied.

### I.      Background

On July 31, 2009, the Kansas Highway Patrol set up drug check signs on east-bound Interstate 70 ("I-70"). Three signs were posted that read, "Drug Check Ahead" and "Drug Dogs in Use" in both English and Spanish. Although no drug checks were actually being conducted on the Interstate, police were positioned on the exit ramps to watch for vehicles evading the supposed "drug check." Around noon on that day, Kansas Highway Patrol Trooper Brian K. Smith was sitting stationary at Exit 332 in Wabaunsee County, Kansas, monitoring vehicles that exited I-70, immediately after going past the drug check lane signs. The exit led to Spring Creek Road, a rural, gravel road speckled with residences. The public road ran north and south. The

exit ramp crossed the road, so that a person could re-enter the Interstate.

At the suppression hearing, Trooper Smith testified that he worked for the Kansas Highway Patrol for over twenty-one years, performing road patrol, investigating accidents, working traffic, and obtaining training to meet certification requirements. He testified that he was certified in standardized field sobriety testing, breath tests, vehicle inspection, and had various other specialized federal and state training in criminal and drug interdiction. He received U.S. Drug Enforcement training, narcotics training, and U.S. Border Patrol training, and had attended various conferences and drug interdiction programs. Trooper Smith testified to extensive on-the-job experience in drug trafficking, contributing to over 145 seizures of illegal drugs and the discovery of over 100 hidden compartments. He was assigned to the U.S. Drug Enforcement task force in Kansas City for two years and did drug interdiction work for the Kansas Highway Patrol since 1991. Throughout his experience with drug check lanes, Trooper Smith testified that he encountered people who would avoid a drug check lane because they possessed narcotics, were driving while intoxicated, were driving with an open container, or without insurance or a driver's license.

Around noon on July 31, 2009, Lieutenant Kirk Simone notified Trooper Smith that a red passenger car had exited I-70 onto Spring Creek Road. Trooper Smith observed the vehicle turn north onto the gravel road toward rural residences. He followed the vehicle in his marked patrol car and contacted dispatch. The vehicle's license tag was registered to a Topeka, Kansas address. Smith thought it odd for a vehicle from Topeka, in Shawnee County, to exit onto a rural Wabaunsee County road, a county adjoining Shawnee County, where no businesses were located for miles. He followed the vehicle. The car passed one house, then the driver turned into the

private driveway of a second residence.  Smith was fifty feet south of the driveway when he saw the driver stop and turn around to look behind him.  The driver gave Smith a startled expression, then put a cigarette in his mouth and backed out of the driveway, turning back in the direction from which it came.

At the suppression hearing, Trooper Smith testified that the driver did not commit any traffic infraction, but he had grown suspicious of the vehicle upon seeing it exit the Interstate onto a rural road immediately after passing the drug check signs; noting the vehicle was registered in Shawnee County, but exited the Interstate in rural Wabaunsee County; and watching the driver pass one house, then turn into a private driveway of a second house and immediately turn around with a startled expression.  At this point, Smith testified that he was suspicious of criminal activity.  In the Incident Narrative Report, Smith recorded that he thought the driver might be casing houses for a rural burglary.  After reviewing the facts at the suppression hearing, Trooper Smith also stated the driver might have been involved in drugs of some kind.  He stopped his patrol car and stepped into the middle of the road, lifting the palm of his hand to stop the driver.  The driver stopped and rolled down the window.  Trooper Smith noticed there were two other occupants in the car.

Smith approached the driver's window, identified himself, and asked where they were coming from.  The driver explained they were coming from Junction City, where they had gone to look at a car.  Smith asked the driver if he could speak with him.  The driver responded "yes" in a mumbled voice, but avoided eye contact.  Smith asked the driver to step out of the vehicle and to produce his identification.  With shaking hands, the driver handed Smith a Kansas driver's license identifying him as Dennis D. Neff.  At the suppression hearing, Smith testified

that defendant Neff looked unkempt and tired, and wore a loose T-shirt and blue jeans. Trooper Smith did a quick patdown search because he could not see Neff's waistband or pockets and wanted to ensure that Neff did not have any weapons on him. Smith asked Neff if he would mind speaking with him in his patrol car. Neff did not look at Smith, but stated that would be okay.

Inside the patrol car, Smith again asked Neff where they were coming from, and Neff responded Junction City, Kansas. Smith asked what kind of car they went to see. Neff said it was a Camaro; he explained he was driving the other two passengers. Smith asked Neff who the other occupants were. Neff stated that the male was Ralfeal Carr and the female was "Meleka," but he did not know her last name. Smith asked who owned the car, and Neff said it was Carr's aunt. Smith noticed that Neff appeared very nervous, reluctant to make eye contact, and was sweating and fidgeting. Although dispatch showed that Neff's driver's license was valid, he was listed as a registered offender.

Smith explained, "It's just kinda odd somebody gets off [from] Shawnee County and goes north here. What were you going to do up here?" Neff answered, "I have a crack pipe on me." At the suppression hearing, Smith testified that he was concerned that if he missed the pipe when he did the patdown search, he may have missed something else. To keep Neff calm, Smith assured him he was not going to arrest him for the crack pipe, but asked Neff if he had crack on him or in the car. Neff said no. Smith called Lt. Simone as backup, and again advised Neff that he was not going to arrest him for "just having a crack pipe." Smith asked Neff to exit the vehicle, stand behind the red car, and remove the crack pipe from his pocket. While standing behind the red car, Neff pulled a white paper napkin wrapped around a silver metal tube from his

rear pocket. From his training and experience, Smith recognized the pipe as one used to smoke meth or crack cocaine and noticed it had burnt residue on it. Smith asked if they had anything else in the vehicle. Neff responded, "No."

Smith saw the male passenger lean out the window and say something he could not hear. Smith approached him and the passenger asked, "What's this about?" Smith explained that there was a narcotics check lane and it was strange to see a Shawnee County vehicle get off the Interstate in Wabaunsee County and pull into a residence. He informed the passenger that Neff had a crack pipe. The passenger rolled his eyes.

Smith returned to Neff and asked if they had anything in the car. Neff responded, "Not that I know of." Again, Smith assured Neff that he would not arrest him "for just a crack pipe." Lieutenant Simone arrived on the scene, but did not help with the search. Smith then returned to the passenger window and asked the passenger for identification. The passenger produced a Kansas identification card showing he was Ralfeal E. Carr. Smith asked him if there were any drugs in the car; he asked Carr to exit the vehicle; and he did a quick patdown search of his person. Smith then asked the back-seat passenger to exit the vehicle. She identified herself as Meleka Holmes. He asked her if there was anything illegal in the car, and she said no. Smith found her identification card in the passenger rear floor area and ran a check with dispatch. Neither Carr nor Holmes had outstanding warrants.

Based on his training and experience, Smith suspected that if there was drug paraphernalia, there would be drugs as well. After everyone was out of the car, Smith searched the passenger compartment. He noticed the vehicle had two fold-down seats to allow easy access to the trunk. He did not find any contraband in the passenger compartment, but he saw

two cell phones in the center console, a can of air freshener behind the front passenger seat, and the movie "Traffic" on the rear floor.  At this point, Smith returned their identification.

Smith asked Carr if the vehicle would re-start after it was shut off.  Carr did not know. Without asking consent, Smith used the key fob to activate the trunk release mechanism.  In the trunk, Smith found four small duffel bags and two white cardboard boxes.  One of the duffel bags, marked "Tommy Hilfiger," contained a smaller black fabric bag.  Smith picked up the bag and felt bundles inside.  He asked the occupants who owned the bag, and Carr said it was his. Smith asked Lt. Simone to call Trooper Scott Morris and his drug dog.  Smith lifted an extremely heavy pink bag from the back of the trunk, which Neff said belonged to him.  Smith unzipped this bag and found seven kilogram-sized brick-shaped objects, later determined to contain cocaine.  Smith arrested all of the occupants.  In the Tommy Hilfiger bag, he found $10,000 in U.S. Currency that was folded into bundles of $1,000s and rubber-banded together.  None of the occupants claimed ownership of the currency.  Both defendants declined to be interviewed.

At the suppression hearing, defense counsel called Zay Thompson as a witness.  Mr. Thompson is an investigator with the Federal Public Defenders Office, and worked in this role since September 2009.  He previously worked as an investigator for the State Public Defenders Office since 2004.  He testified that Spring Creek Road runs north and south until it intersects with Bison Road.  A driver may take Bison Road west until it winds south and intersects with Sunflower Road.  Sunflower Road intersects with Spring Creek Road, which runs south to I-70. Thompson testified that there were no "No Trespassing" signs on any of the roads he traveled.

On August 12, 2009, both defendants were indicted on two counts:  (1) conspiracy to

possess and distribute a substance containing cocaine hydrochloride;[1] and (2) knowingly and intentionally possessing with intent to distribute seven kilograms of a substance containing cocaine hydrochloride.[2]  The government stipulated that defendant Carr was a co-owner of the Monte Carlo driven by defendants on July 31, 2009.

## II.    Discussion

Defendants Ralfeal Carr and Dennis Neff have filed separate motions to suppress. Defendant Carr argues the warrantless search of the car was unreasonable because (1) neither the owner nor the driver gave permission to search the vehicle; and (2) no one was under arrest at the time Trooper Smith conducted the search, thus, the search was not valid under the search-incident-to-arrest exception to the Fourth Amendment.  At the suppression hearing, the government withdrew all arguments regarding standing[3] and clarified that it was not relying on the search-incident-to-arrest exception to the Fourth Amendment warrant requirement, but was basing the search on the automobile exception.  Defendant Neff argues: (1) Trooper Smith did not have reasonable articulable suspicion of criminal activity to justify the initial stop; (2) the patdown search was unlawful because there was no reasonable suspicion to believe defendants were armed and dangerous; and (3) the search of the vehicle was an invalid search-incident-to-arrest because no one was arrested at the time of the search.  Thus, defendants argue the evidence discovered in the vehicle was fruit of the poisonous tree.  The Court addresses

---

[1]This Count is in violation of 21 U.S.C. § 846, with reference to 21 U.S.C. §§ 841(a)(1), 812, 841(b)(1)(A)(ii), and 18 U.S.C. § 2.

[2]This Count is in violation of 21 U.S.C. § 841(a)(1), with reference to 21 U.S.C. §§ 812, 841(b)(1)(A)(ii), and 18 U.S.C. § 2.

[3]The government withdrew arguments presented in Document 28.

defendants' arguments simultaneously.

A traffic stop is a seizure "within the meaning of the Fourth Amendment."[4] "However, because a traffic stop is 'necessarily [a] swift action predicated upon the on-the-spot observations of the officer on the beat,' an officer need only reasonably suspect that a crime is in the offing to justify such a detention."[5] Under the Fourth Amendment and *Terry v. Ohio*,[6] a traffic stop is reasonable only if (1) the officer's action was "justified at its inception," and (2) the detention was "reasonably related in scope to the circumstances which justified the interference in the first place."[7]

### A.     Initial Stop

Under Tenth Circuit precedent, a traffic stop is valid at its inception "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring,"[8] or if the police officer has a "reasonable, articulable suspicion that criminal activity is afoot."[9] "Instead of closing their eyes to suspicious circumstances, officers may call on their own experience and training to judge facts and even 'perceive meaning in actions that appear innocuous to the untrained observer.'"[10] In

---

[4] *United States v. Pena-Montes*, – F.3d – , 2009 WL 4547058, at *3 (10th Cir. Dec. 7, 2009) (citing *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008)).

[5] *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20–21 (1968)).

[6] 392 U.S. 1 (1968).

[7] *Id.* at 19–20.

[8] *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

[9] *United States v. Lambert*, 351 F. Supp. 2d 1154, 1160 (D. Kan. 2004) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

[10] *Id.* (quoting *United States v. Gutierrez-Daniez*, 131 F.3d 939, 942 (10th Cir. 1997)).

determining whether a detention was supported by reasonable suspicion, the court looks at the totality of the circumstances.[11]  A detaining officer's subjective motivations in effecting the stop are irrelevant.[12]  Instead, the court looks to determine "whether 'the facts available' to the detaining officer, at the time, warranted an officer of 'reasonable caution' in believing 'the action taken was appropriate.'"[13]  Furthermore, a good faith and objectively reasonable mistake of fact may weigh in favor of reasonable suspicion.[14]  If reasonable, articulable suspicion of criminal activity exists, a law enforcement officer has authority to effect a limited investigatory detention "in order to determine [the person's] identity or to maintain the status quo momentarily while obtaining more information."[15]

Defendant Neff argues that Trooper Smith's suspicions of criminal activity were not objectively reasonable because they were based on the following facts: a vehicle with a Shawnee County license tag turned onto Exit 332 in rural Wabaunsee County, and used the driveway of a private residence to turn around.  The Court finds, when the facts are viewed under the totality of the circumstances, however, Trooper Smith's suspicions were reasonable and justified a short investigative detention.

"Reasonable suspicion" cannot be based on "[i]nchoate suspicions and unparticularized

---

[11]*United States v. Pena-Montes*, – F.3d – , 2009 WL 4547058, at *3 (10th Cir. Dec. 7, 2009).

[12]*United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (citing *United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir. 2008); *Botero-Ospina*, 71 F.3d at 787).

[13]*Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)).

[14]*Id.* (citations omitted).

[15]*United States v. Lambert*, 351 F. Supp. 2d 1154, 1160 (D. Kan. 2004) (citations omitted).

hunches."[16]  The "specific and articulable facts and rational inferences drawn from those facts" must "give rise to a reasonable suspicion a person has or is committing a crime," but it need not entirely rule out *all* possibility of innocent conduct.[17]  Courts are not to segregate each fact and evaluate it for reasonable suspicion in isolation; rather, they are to look at the totality of the circumstances.[18]  In determining the presence of reasonable suspicion justifying an investigative detention, therefore, the court "defer[s] to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."[19]  In the end, "the level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause."[20]

Here, defendants drove past a clearly marked Interstate sign notifying travelers of an upcoming drug check.  Although there was no drug check, immediately after passing the sign, the car took Exit 332, which led to a gravel road interspersed with country residences in rural Wabaunsee County.  Trooper Smith testified that there were no businesses located on this Exit for miles.  This particular Exit, therefore, had very little utility for Interstate travelers unless they were seeking to access the houses located on those particular gravel roads.  Trooper Smith noticed that the car taking this Wabaunsee County exit had a Shawnee County license plate.  He

---

[16]*United States v. Santio*, No. 08-4216, 2009 WL 3526502, at *4 (10th Cir. Oct. 30, 2009).

[17]*Id.* (citations omitted).

[18]*United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008) ("[E]ven factors that are entirely innocent when taken separately can support a lawful detention if, taken together, they reasonable suggest the presence of illegal conduct.") (citing *United States v. Ramirez*, 479 F.3d 1229, 1244 (10th Cir. 2007)).

[19]*Santio*, 2009 WL 3526502, at *4 (quoting *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001)).

[20]*United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (citations omitted).

testified that, from his extensive training and experience, people avoid a drug check lane because they are carrying drugs, they have an open container, or they are driving without a license or without insurance. Smith watched the car turn down the gravel road and pass one house before pulling into the private driveway of a second residence. After pulling into the drive, the driver turned around in his seat and noticed the Trooper behind him. The driver gave Trooper Smith a startled expression, placed a cigarette between his lips, and immediately pulled out of the driveway. Trooper Smith had reason to believe the driver was attempting to evade him.

The Supreme Court has held that, although a defendant's presence in a high-crime area is not sufficient to warrant an investigative detention, a person's intentional evasion of police while in a high-crime area and apparent "nervous, evasive behavior" are pertinent factors in determining whether the stop was supported by "reasonable suspicion."[21] Based on his extensive training and experience in drug interdiction, Trooper Smith's good faith observations on July 31, 2009, were sufficient under the totality of the circumstances to rise to the level of "reasonable suspicion" that the driver and occupants were evading the drug check lane or attempting to avoid Trooper Smith because they were engaged in illegal activity, whether it was the transport of drugs or casing houses for a possible burglary, as Trooper Smith originally suspected.[22] The driver left the Interstate immediately after passing drug check signs; however, he did not immediately loop back onto the Interstate at the first available opportunity, nor did he use the

---

[21]*Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) ("In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.").

[22]*See United States v. Smith*, 396 F.3d 579, 586–87 (4th Cir. 2005). The Fourth Circuit has held that evading a police roadblock may be one factor contributing to a reasonable suspicion of criminal activity when considered in combination with other suspicious facts.

first available private driveway to turn around; his license plate indicated he did not live in Wabaunsee County; furthermore, when he noticed the patrol car behind him, he seemed unsettled and immediately pulled out of the private drive. Based on Trooper Smith's training and experience, such uncertain driving patterns immediately after passing signs indicating a drug check, and the driver's nervous reaction upon seeing a marked patrol car, were sufficient to establish reasonable suspicion for a short investigatory detention.[23]

### B. *Racial Profiling*

In his motion to suppress, defendant Neff briefly argues that Trooper Smith's decision to stop defendants' vehicle was an act of racial profiling in violation of the Equal Protection Clause of the United States Constitution, because the driver was a Caucasian male and the front passenger was an African-American male.[24] Defendant bears the burden of showing "the officer knew defendant's race or skin color before deciding to stop or detain him, and that his decision was motivated in part by defendant's race or skin color."[25]

Defendant Neff did not present any evidence tending to show that his race, or the race of the other occupants in the vehicle, played any part in Trooper Smith's decision to stop or detain

---

[23]*See United States v. Flores*, No. 06-40059-02-RDR, 2006 WL 2264840, at *4 (D. Kan. Aug. 8, 2006) (holding that defendant's decision to exit the Interstate onto a rural road just after passing signs indicating a drug check lane ahead supported deputy sheriff's reasonable suspicion of illegal activity); *United States v. Lambert*, 351 F. Supp. 2d 1154, 1160–61 (D. Kan. 2004) (holding that highway patrol trooper had reasonable suspicion for investigatory detention of defendant where it was reasonable to infer that defendant took highway exit to avoid what he believed was drug check lane ahead).

[24](Doc. 27 at 2.)

[25]*United States v. Mercado-Nava*, 486 F. Supp. 2d 1271, 1274 (D. Kan. 2007) (citing *United States v. Aliperti*, No. 02-40020-01-JAR, 2002 WL 1634440, at *3 (D. Kan. June 11, 2002); *United States v. Villanueva*, 157 F. Supp. 2d 1184, 1190 (D. Kan. 2001)).

him.[26]  At the suppression hearing, Trooper Smith testified that he did not know the number of occupants or their races until after he approached the vehicle.  Furthermore, as discussed above, the Court finds that the traffic stop was objectively reasonable under the Fourth Amendment.[27]

### C.     Patdown Search

Next, defendant Neff argues Trooper Smith's patdown search was an unreasonable search because there was no reason to believe defendant was armed and dangerous.  The government gives three justifications for the patdown search: (1) It was a rural traffic stop in a secluded area, posing a danger to officer safety; (2) Trooper Smith suspected illegal drugs were being transported, which often involve the use of guns; and (3) Defendant Neff's nervous behavior and refusal to make eye contact indicated to Trooper Smith that "something was up."

"[W]hen police officers stop a vehicle to investigate its occupants, '[p]olice officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo.'"[28]  During a traffic stop, an officer may order the driver and the occupants to exit the vehicle and may perform a "patdown" of all occupants "upon reasonable suspicion that they may be armed and dangerous."[29]  The circumstances must be such as to present an "articulable and reasonable suspicion that the person is presently armed and dangerous."[30]  The officer needs only

---

[26]*See id.*

[27]*See United States v. Adkins*, 1 F. App'x 850, 851 (10th Cir. 2001) (addressing a claim brought under the Equal Protection Clause and concluding, "[s]o long as the traffic stop was objectively reasonable, the officer's subjective motivations are irrelevant").

[28]*United States v. Lazos*, 314 F. App'x 127, 131 (10th Cir. 2009) (quoting *United States v. Garcia*, 459 F.3d 1059, 1063 (10th Cir. 2006)).

[29]*Knowles v. Iowa*, 525 U.S. 113, 117–18 (1998) (citations omitted).

[30]*United States v. Wald*, 216 F.3d 1222, 1227 (10th Cir. 2000) (citations omitted) (holding that an *objective* belief that the defendant is presently armed and dangerous is necessary to justify a patdown search, but declining to decide whether an officer must also have a *subjective* belief in a case where the officer was merely searching for the

a "minimum level of objective justification"[31] and may base his decision on "reasonable inferences based on training, experience, and common sense."[32] "'The purpose of the limited pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.'"[33]

The Court finds a patdown search was justified to ensure officer safety under the totality of the circumstances in this case. There were three persons in the car, and Trooper Smith confronted them in a rural location by himself, removed from other traffic. The driver appeared to be avoiding a drug check lane, raising an inference that he might be carrying drugs. When Trooper Smith asked for Neff's identification, he noticed Neff's hands were visibly shaking and he avoided eye contact. Furthermore, because Neff's clothing was baggy, Trooper Smith could not see his waistline where a gun might be tucked. Trooper Smith testified that he was unsure when "fight or flight" would affect this defendant. Furthermore, there was reasonable suspicion to believe the defendants were engaged in drug dealing, a crime often accompanied by firearms and violence.[34] If defendants were evading officers by taking a rural exit, the motive to evade law enforcement officers was still a reality after the traffic stop. There was articulable,

---

presence of drugs).

[31]*Lazos*, 314 F. App'x at 131 (quoting *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007)).

[32]*Rice*, 483 F.3d at 1083 (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

[33]*Lazos*, 314 F. App'x at 131 (quoting *United States v. Sanchez*, 519 F.3d 1208, 1216 (10th Cir. 2008)).

[34]*Rice*, 483 F.3d at 1083 (noting the confrontational nature of traffic stops and recognizing that "'[r]esort to a loaded weapon is an increasingly plausible option for many such motorists to escape those consequences.'"); *see also United States v. Garcia*, 459 F.3d 1059, 1065 (10th Cir. 2006) (citing cases from various Circuit Courts of Appeal in which the courts held that a reasonable suspicion people were engaged in a drug transaction supported a reasonable inference that the suspects might be armed and dangerous); *United States v. Peek*, 184 F. App'x 782, 788 (10th Cir. 2006) (citing cases in which courts have held that a reasonable suspicion of drug trafficking activity supports a reasonable suspicion that suspect might be armed and dangerous).

reasonable suspicion to believe the defendant was presently armed and dangerous, justifying a limited patdown search of Neff's person.

Defendant Neff cites *United States v. Wald*[35] as an analogous case, wherein the patdown search was held to be unreasonable. The facts, however, are not analogous. In *Wald*, the officer asked the occupants to exit the vehicle and requested permission to look through the passenger compartment for drugs.[36] He completed the search of the passenger compartment before he turned around and performed the patdown search of the defendant "primarily to look for drugs."[37] The district court that held such a search was unreasonable.[38] If there was any danger to the officer in *Wald*, his decision to exercise precaution after-the-fact only confirmed the lack of danger under the circumstances. Here, Trooper Smith made the decision to secure his safety soon after Neff exited the vehicle, acting upon his belief that it was necessary to take precaution.

### D. *Fruit of the Poisonous Tree*

Defendant Neff argues that all evidence discovered in the trunk of the car was fruit of an unlawful stop and an unlawful patdown search. The government argues the traffic stop and the patdown search were lawful, but if the Court should find the patdown search to be unlawful, probable cause to search the trunk came from an independent source: Neff's confession to possessing a crack pipe.

To have evidence suppressed under the fruit of the poisonous tree doctrine, defendant

---

[35] 216 F.3d 1222 (10th Cir. 2000).

[36] *Id.* at 1225.

[37] *Id.*

[38] *Id.*

must show: (1) his Fourth Amendment rights were violated, and (2) a factual nexus between the illegality and the challenged evidence.[39]  Under the second prong, defendant must show "but for" causation whereby "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[40]  The burden then shifts to the government.  "[T]he government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation."[41]

Assuming *arguendo*, that the patdown search was unlawful, the defendant has not shown "but for" causation under these facts.  The patdown of defendant Neff did not produce incriminating evidence of any kind.  Rather, when Neff was sitting in the patrol car, he volunteered that he had a crack pipe on his person, which led Trooper Smith to investigate the car further.  The Court finds that even if the patdown search was not supported by reasonable suspicion, it was not the "but for" cause of Trooper Smith's search of the trunk.

Furthermore, "[a] source is genuinely independent if the government can show that the evidence was obtained by 'means sufficiently distinguishable to be purged of the primary taint.'"[42]  On the other hand, if "'[the evidence has] been come at by the exploitation of the illegality,'" the source is not independent and the taint of the preceding illegality has not been

---

[39]*United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006).

[40]*Id.*

[41]*Id.* (citing *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)); *see United States v. Forbes*, 528 F.3d 1273, 1276 (10th Cir. 2008) (noting that, under the independent source doctrine, the illegal search of the trailer did not produce any evidence or lead to search of the tractor where evidence was found).

[42]*United States v. Forbes*, 528 F.3d 1273, 1278 (10th Cir. 2008) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

purged.[43]

Here, the patdown search had no bearing on the subsequent conversation in the patrol car. After enduring the allegedly unlawful patdown search and entering the patrol car, defendant Neff volunteered that he was carrying a crack pipe. The Court finds that, even if the patdown search was unlawful, it did not lead to the discovery of *any* incriminating evidence, and the evidence that *was* discovered was not the product of the patdown search.[44]

## E.     Search of the Vehicle

Finally, both defendants argue the search of the vehicle was an invalid search-incident-to-arrest because no one was arrested at the time the search took place and no one had access to the car at the time of the search. The government, however, argues that it is not relying on the search-incident-to-arrest, but on the automobile exception. It argues that Neff volunteered he had a crack pipe on his person, raising a fair probability that there were drugs in the vehicle itself.

"[T]he warrantless search of an automobile is justified by the vehicle's inherent mobility and the diminished expectation of privacy which surrounds the automobile."[45] "Under the automobile exception to the Fourth Amendment's warrant requirement, 'police officers who

---

[43]*Id.* (quoting *Wong Sun*, 371 U.S. at 488).

[44]*See id.* at 1280 ("Nothing that led agents to the truck's tractor was in any sense derived from the search of the trailer. Even under the facts alleged by Forbes, border agents did not recover contraband or discover any evidence of wrongdoing when they entered the trailer. It is therefore impossible to say that the later discovered evidence could have been the product of the earlier unconstitutional search.").

[45]*United States v. Arzaga*, 9 F.3d 91, 94 (10th Cir. 1993) (citing *United States v. Chadwick*, 433 U.S. 1, 12 (1977)); *see United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007) ("Although the automobile exception is based in part on exigency, 'the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.'" (citations omitted)).

have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'"[46] "'Probable cause to search a vehicle is established if, under the *totality of the circumstances* there is a fair probability that the car contains contraband or evidence.'"[47] "Contraband" includes "unlawful drugs."[48] "'In determining whether probable cause exists, an officer may draw inferences based on his own experience.'"[49] The court must evaluate probable cause "in relation to the circumstances as they would have appeared to a prudent, cautious and trained police officer."[50] If his suspicions rise to the level of probable cause, he is "empowered to search the entire vehicle, including the trunk"[51] and "*any* package within the vehicle that is capable of concealing the object of the search."[52]

The permissible scope of a search under the automobile exception is defined by the nature of the probable cause that justifies the search. "If probable cause to search a vehicle exists, the police may search the entire vehicle, including the trunk and *all* containers within the vehicle that might contain the object for which they are searching."[53] However, "[i]f the police

[46]*United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009) (quoting *Florida v. Meyers*, 466 U.S. 380, 381 (1984)).

[47]*United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004) (emphasis in original) (internal citations omitted).

[48]*Illinois v. McArthur*, 531 U.S. 326, 331–32 (2001).

[49]*Jurado-Vallejo*, 380 F.3d at 1238 (quoting *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002)).

[50]*United States v. Lopez*, 777 F.2d 543, 551 (10th Cir. 1985) (citing *United States v. McCormick*, 468 F.2d 68, 73 (10th Cir. 1972), *cert. denied*, 410 U.S. 927 (1973)).

[51]*United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009) (citation omitted).

[52]*United States v. Howe*, 313 F. Supp. 2d 1178, 1185 (D. Utah 2003) (quoting *United States v. Edwards*, 242 F.3d 928, 939 (10th Cir. 2001)) (emphasis in original).

[53]*United States v. Hanks*, 821 F. Supp. 1425, 1430 (D. Kan. 1993) (citing *United States v. Ross*, 456 U.S. 798, 820–21 (1982)) (emphasis added).

only have probable cause to search a container recently placed in the vehicle, they may search that container, but the search may not extend to other parts of the car."[54] "The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the *object of the search* and the *places in which there is probable cause* to believe that it may be found."[55]

The Tenth Circuit has limited this very broad automobile exception in cases where the "smell" of drugs is detected, but there is absolutely no other evidence of drugs in the car. If an officer claims to have smelled freshly burnt drugs, but has no other corroborating evidence of drugs in the car, he may search the passenger compartment on probable cause that evidence of recent drug use may be found.[56] If this search produces any corroborating evidence of illegal contraband, he can extend his search to the trunk.[57] If the search of the passenger compartment

---

[54]*Id.* (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)).

[55]*United States v. Ross*, 456 F.2d 798, 824 (1982) (emphasis added). The Supreme Court held that, under the automobile exception, the scope of a permissible search is no narrower and no broader than that which a magistrate judge might authorize on the basis of probable cause. *Id.* at 823. "When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand." *Id.* at 821.

The Fifth Circuit clarified the Supreme Court's holding as follows: "[I]f officers have probable cause to believe that contraband is in only one part of the car, then they are limited to that area. If, on the other hand, officers have probable cause to believe that contraband is located somewhere in a car, but they don't know exactly where, then they can search the entire vehicle." *United States v. Seals*, 987 F.2d 1102, 1107 n.8 (5th Cir. 1993).

[56]*United States v. Wald*, 216 F.3d 1222, 1226 (10th Cir. 2000); *United States v. Nielsen*, 9 F.3d 1487, 1491 (10th Cir. 1993).

[57]*Wald*, 216 F.3d at 1226; *see United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998). In *Downs*, the Tenth Circuit explained:

> [T]he smell of burnt marijuana is generally consistent with personal use of marijuana in the passenger compartment of an automobile. In such a case, therefore, there is no fair probability that the trunk of the car contains marijuana and an officer must limit the search to the passenger compartment absent corroborating evidence of contraband. When, on the other hand, an officer encounters, as was the case here, the overpowering

produces no additional evidence, however, his search is done.[58]  On the other hand, the Tenth

Circuit has treated a drug dog alert as more reliable than a police officer's sense of smell, and a

drug dog alert automatically gives the officer probable cause to search the entire car, including

the trunk.[59]  Furthermore, an officer's smell of *raw* marijuana, in contrast to the smell of *burnt*

marijuana, establishes probable cause to search the trunk.[60]

Courts have generally treated the visible, physical presence of drug paraphernalia as

much stronger evidence establishing probable cause to believe that evidence of drug crimes is

present in the vehicle than the mere "smell" of burnt drugs detected by a law enforcement

officer.[61]  While the smell of burnt marijuana (without any other evidence or suspicious

---

smell of raw marijuana, there is a fair probability that the car is being used to transport
large quantities of marijuana and that the marijuana has been secreted in places other than
the passenger compartment.  Accordingly, in such circumstances, a search of the trunk is
appropriate.

*Id.* (internal citations omitted).

[58]*Nielsen*, 9 F.3d at 1491.

[59]*See United States v. Stewart*, 473 F.3d 1265, 1270 (10th Cir. 2007); *United States v. Melcher*, No. 07-cr-0018-01-CVE, 2007 WL 2254347, at *5–*6 (N.D. Okla. Aug. 3, 2007) (citing *United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004)).

[60]*United States v. Vasquez-Castillo*, 258 F.3d 1207, 1213 (10th Cir. 2001).

[61]*See United States v. Seals*, 987 F.2d 1102, 1107 (5th Cir. 1993) (holding that the presence of a glass pipe with cocaine residue between the front seats, in addition to "the defendant's nervousness and false answers, coupled with the modification of the rear seat [to access the trunk], provided the officers with probable cause to believe that additional drugs were contained within the vehicle.  Since they did not know exactly where in the car the drugs were located, the officers had probable cause to search the entire vehicle."); *United States v. Sparks*, 291 F.3d 683, 692 (10th Cir. 2002) (holding that, because officer knew of defendant's prior drug activity and was executing a warrant on defendant for drug trafficking at the time he saw plastic baggies on the front seat on the truck, the plastic baggies gave the officer probable cause to search the entire vehicle for "additional evidence of criminal wrongdoing"); *United States v. Munoz*, No. 4:08CR3069, 2008 WL 5069822, at *4 (D. Neb. 2008) ("The discovery of drug paraphernalia (even without any drug residue) provides probable cause to search the entire automobile in which the paraphernalia were found for the presence of controlled substances."); *United States v. Rios*, No. 02-40155-01-RDR, 2003 WL 22000567, at *4 (D. Kan. May 9, 2003) (holding that officer's plain view of a bong in the driver's backpack gave him probable cause to search the backpack and the car for evidence of drug crimes because it warranted "the belief of an objectively reasonable person that a drug offense had been or was being committed and that evidence of a drug crime would be found in the backpack and the car."); *United States v. La Fountain*, 252 F.

circumstances) may indicate recent drug use (possibly even emanating from a passenger's shirt), physical and visible evidence of a crack pipe would be tangible evidence creating probable cause that drugs may be found somewhere among the bags/boxes/trunk where the passenger's or driver's belongings are located. A presence of a pipe could indicate either that the person used drugs recently, or had drugs in one of his bags for later use. Regardless of whether the officer expects to find large or small quantities, there is probable cause that some illegal substance may be among the person's belongings (not just emanating from his clothing), and his belongings may be anywhere in the car, including in closed containers in the trunk.[62]

Defendant Neff cites to *United States v. Wald*.[63] However, the Court finds the case distinguishable on its facts. In *Wald*, an officer made a valid traffic stop, and detected the odor of burnt marijuana coming from the vehicle.[64] He also noticed Visine and a road atlas in the passenger compartment, which are occasionally associated with drug trafficking.[65] Expecting to find drugs on the driver, the officer did a quick patdown search and discovered two pipes in his pocket, and proceeded to search the entire vehicle and its trunk under the automobile exception.[66]

---

Supp. 2d 883, 889 (D.N.D. 2003) (discovering a crack pipe in plain view, and later discovering tinfoil and baggies on the floor, gave him probable cause to search the truck).

[62]At least twice, the Tenth Circuit has rejected the "personal use" argument raised by defendants to limit the officer's search under the automobile exception. Whether the amount of drugs found in the passenger compartment was minuscule, or the equipment found was more indicative of personal use than of drug manufacture, the Tenth Circuit has found that physical evidence of drug contraband (beyond the mere smell of burnt marijuana) is sufficient to warrant a search of the entire vehicle under the automobile exception. *See, e.g., United States v. Nielsen*, 9 F.3d 1487, 1490 (10th Cir. 1993); *United States v. Loucks*, 806 F.2d 208, 211 (10th Cir. 1986) (discussing *United States v. Burnett*, 791 F.2d 64 (6th Cir. 1986)).

[63]216 F.3d 1222 (10th Cir. 2000).

[64]*Id.* at 1225.

[65]*Id.*

[66]*Id.*

The Tenth Circuit held that the patdown search was unlawful because the officer was not searching for weapons, but for drugs.[67] Thus, the pipes subsequently discovered in Wald's pockets could not be considered in determining whether there was probable cause to search the trunk of the vehicle.[68] The Court declined to decide whether the pipes would have changed its probable cause analysis.[69] The case, therefore, has little bearing on the present matter.

A more analogous case rose to the Tenth Circuit in 2005. In *United States v. Bradford*,[70] the officer made a valid traffic stop. The driver exhibited signs of extreme nervousness; the officer asked her to follow him to the patrol car where he asked her questions and checked her vehicle rental agreement.[71] After extensive questioning and evasive answers, the officer decided to call for a K-9 unit, at which point, the driver volunteered that she had a marijuana pipe in the car as well as a small bag of marijuana.[72] She produced those items for the trooper.[73] The trooper proceeded to search the entire car, including the trunk.[74] The Tenth Circuit stated,

> Here, it was clear there was marijuana in the passenger compartment of the vehicle, so there was no need for the corroboration of the smell of marijuana or for a drug-sniffing dog. When Ms. Bradford gave Trooper Peech the bag of marijuana and pipe from the car, the actual existence of drugs was proven and no further corroboration was necessary. At that point, Trooper Peech had probable cause to search anywhere else in the

---

[67]*Id.* at 1226–27.

[68]*Id.* at 1227.

[69]*Id.*

[70]423 F.3d 1149 (10th Cir. 2005).

[71]*Id.* at 1152–55.

[72]*Id.*

[73]*Id.*

[74]*Id.*

car that contraband might be present, including the trunk. This is particularly true given Ms. Bradford's attempt to circumvent a K-9 inspection by confessing to the marijuana. Were we to conclude otherwise, we would create an perverse incentive for drug smugglers carrying large amounts of contraband to confess to small amounts of marijuana to avoid further inspection. Probable cause existed here.[75]

In *United States v. White*,[76] the District Court held that the two pipes found in the passenger compartment of the car "sufficiently corroborated a suspicion of contraband to permit officers to search the trunk."[77]

Here, however, the crack pipe was found on defendant Neff's person rather than in the vehicle itself. This does not negate the fact that Neff was previously sitting in the car; in fact, he was driving the car. A similar argument was raised in *United States v. Parker*,[78] in which the defendant argued that, because the corroborating evidence was found on his person, it did not "establish probable cause to search the trunk in the same way as does the finding of evidence in the passenger compartment of the vehicle."[79] The Tenth Circuit adopted the following rationale:

[D]efendants' reasoning would create a rule in which the expectation of privacy in the trunk of a car varies depending on whether the driver places the contraband in his pockets instead of placing the contraband elsewhere in the passenger compartment. Fourth Amendment protections against unreasonable search and seizure cannot fluctuate on the basis of such

---

[75]*Id.* at 1160 (internal citations omitted), 1159 ("A reasonable officer would think that a suspect might confess to a small amount of drugs in order to avoid an investigation which would reveal a much larger amount of drugs. Coupled with her nervousness and evasiveness, we conclude the totality of the circumstances facing Trooper Peech gave rise to probable cause there would be contraband in the trunk.").

[76]No. CRIM.A.04-20047-01-K, 2004 WL 2182188 (D. Kan. Sept. 21, 2004).

[77]*Id.* at *3.

[78]72 F.3d 1444 (10th Cir. 1995).

[79]*Id.* at 1451. Officers detected the smell of marijuana in the car and, during a lawful frisk of defendant's person for weapons, they found a "rolled-up dollar bill with white powder residue and [a] marijuana cigarette." *Id.* at 1450.

arbitrary and nonsensical distinctions.[80]

The Tenth Circuit upheld the search of the trunk based on the smell of marijuana in the passenger compartment and the corroborating evidence on defendant's person.[81]

Here, the presence of probable cause is thinner. The Trooper did not smell any drugs in the passenger compartment before learning that defendant Neff had a crack pipe on his person. Nevertheless, the Court finds that the facts leading up to the search of the trunk established a minimal level of probable cause that contraband was located in the car, justifying a warrantless search of the entire vehicle, including the trunk. The following facts raised a "fair probability" that drugs might be found in the car: (1) Trooper Smith stopped the car on the articulable, reasonable suspicion that it was avoiding a drug check lane, allowing for a reasonable inference that the occupants may be involved in drug crimes; (2) Defendant Neff was extremely nervous, shaky, and sweating throughout the encounter, such that he did not calm down even when Troop Smith repeatedly assured him he would not be arrested for possession of a crack pipe;[82] (3) Defendant Neff appeared disheveled as if he had not slept in many hours; (4) Defendant Neff voluntarily admitted he had a crack pipe on him; (5) When Neff produced the crack pipe, it had residue on it from previous use; (6) Trooper Smith searched the passenger compartment where he noticed a can of air freshener between the seats; and (7) Trooper Smith noticed that the back seat folded down, allowing for easy access to the trunk. Although each fact alone may not rise to the level of probable cause, the Court finds that, collectively, they created a "fair probability"

---

[80] *Id.* (quoting district court opinion, and stating "[w]e agree").

[81] *Id.*

[82] *See United States v. West*, 219 F.3d 1171, 1179 (10th Cir. 2000) (noting that unusually persistent nervousness and the scent of air freshener can be contributing factors in the overall probable cause determination).

that evidence of drug crimes might be found in the vehicle, empowering Trooper Smith to search the entire car, including the trunk and any container where such drugs might be concealed.[83]

Trooper Smith did not base the search on the *smell* of drugs, but on the actual presence of drug paraphernalia on defendant Neff's person – the driver of the car. The crack pipe, furthermore, had burnt residue on it, indicating that the pipe had been used to ingest drugs. When these facts are combined with the other facts leading up to, and including, the search of the passenger compartment, the Court finds that there was probable cause to search the entire vehicle for evidence of drug crimes.[84] "The scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found."[85] Trooper Smith had probable cause to believe there were drugs located in the vehicle. Once probable cause is established under the automobile exception, the officer is not required to make a distinction between a driver's belongings and those belonging to passengers.[86]

---

[83]*See United States v. Seals*, 987 F.2d 1102, 1107 (5th Cir. 1993) (holding that the presence of a glass pipe with cocaine residue between the front seats, in addition to "the defendant's nervousness and false answers, coupled with the modification of the rear seat [to access the trunk], provided the officers with probable cause to believe that additional drugs were contained within the vehicle. Since they did not know exactly where in the car the drugs were located, the officers had probable cause to search the entire vehicle.").

[84]*See United States v. Lunca-Santana*, 128 F. App'x 42, 49 (10th Cir. 2005) ("The officers found a glass pipe identified as illegal drug paraphernalia that was sufficient to establish probable cause at least to continue the search of the vehicle's passenger area. . . . The officers then located a potentially altered map case that would not open and a suspicious red button that appeared to have no function, indicating the possibility of drug trafficking. Thus, the district court properly concluded that the officers had probable cause to search the entire vehicle and arrest the occupants of the vehicle.").

[85]*United States v. Ross*, 456 U.S. 798, 824, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

[86]*Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) ("In sum, neither *Ross* itself nor the historical evidence it relied upon admits of a distinction among packages or containers based on ownership. . . . A passenger's personal belongings, just like the driver's belongings or containers attached to the car like a glove compartment, are 'in' the car, and the officer has probable cause to search for contraband *in* the car.") (emphasis in original).

**IT IS THEREFORE ORDERED** that defendant Carr's Motion to Suppress (Doc. 18)

and defendant Neff's Motion to Suppress Evidence (Doc. 27) are **DENIED.**

**IT IS SO ORDERED.**

Dated: January 5, 2010

                               S/ Julie A. Robinson
                               JULIE A. ROBINSON
                               UNITED STATES DISTRICT JUDGE